Samuel E. Kramer, Esq.
225 Broadway - Suite 3300
New York, New York 10007
(212) 285-2290
*Attorney for Plaintiff, DNT Enterprises, Inc.*
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X     Case No.:07 Civ. 8661 (LSS)
DNT ENTERPRISES, INC.,                                     ECF CASE

               Plaintiff,            **AFFIDAVIT OF NEIL THAKKER**
     -against-                                 **IN OPPOSITION TO DEFENDANT'S**
                                   **MOTION TO DISMISS OR,**
TECHNICAL SYSTEMS,                                        **ALTERNATIVELY,**
A DIVISION OF RAE CORPORATION,                            <u>**TO TRANSFER THE CASE**</u>

              Defendant.
-----------------------------------------------------X
STATE OF NEW YORK      :
              SS  :
COUNTY OF NEW YORK  :

        NEIL THAKKER, being duly sworn, deposes and says:

<u>**PRELIMINARY STATEMENT:**</u>

1.        I am the president of plaintiff, DNT Enterprises Inc.   I am fully familiar with all the facts hereinafter set forth herein by reason of my personal knowledge thereof and can and shall testify with respect to same if called as a witness herein.

2.        I submit this affidavit in opposition to the motion by defendant, Technical Systems, a Division of RAE Corporation, to dismiss plaintiff's Amended Complaint because defendant alleges it "is not subject to personal jurisdiction in New York" or, alternatively, to transfer this case to the Northern District of Oklahoma ("Defendant's Motion"); *see*, ¶2 of the Affidavit of Eric Swank, sworn to February 28, 2008 (the "Swank Aff."). A copy of the Amended Complaint is annexed hereto as Exhibit A.

3.          Each and every year since 1996, plaintiff has been the exclusive representative of

defendant in the New York metropolitan area, pursuant to twelve consecutive annual written

agreements, all of which were written by defendant, and none of which contained a "venue"

clause.   Pursuant to these exclusive representation agreements, approximately $17 Million

worth of Heating, Ventilation, Air Condition or Refrigeration ("HVACR") machinery,

products and equipment manufactured by defendant  – including close to $1 Million in the

first nine months of 2007   –   were sold to plaintiff, with title passing to plaintiff, and

thereafter delivered to plaintiff's customers in New York.

4.          The Swank Aff. fails to negate the fact that, since 1996, and including in 2007,

defendant repeatedly and continually invoked the benefits and protections of New York's

laws and, thus, subjected itself to New York jurisdiction.   All defendant's activities in New

York since 1996, including those in 2007, were purposeful, substantial and bore a direct

relationship with the claim asserted herein and included:

a.          Applying for and obtaining "MEA" (*i.e.,* material and equipment acceptance)

numbers from the New York City Building Department ("NYC Building Dept.") as

recently as 2006,  so that defendant's HVACR equipment could be legally sold and

installed in the City of New York, as required by the New York City Administrative

Code and, specifically, the Building Code (the "NYC Building Code").

b.          Developing coolers, chillers, compressors and other items which complied

with the highly specific and unique requirements of the Administrative Code relating

to HVACR machinery, products and equipment, including specifically, provisions

of the law relating to maintenance, refrigeration and the emanation of sound.

-2-

c. Entering New York personally by sending defendant's officers and employees – not subcontractors, representatives or third-parties – to New York in connection with the installation of HVACR machinery, products and equipment, as well as social events sponsored by plaintiff, from 1998 through and including 2007.

d. Inserting itself into New York by placing thousands of telephone calls, e-mails and correspondence into New York – including hundreds of such contacts relating to the 2007 representation agreement – in connection with sales of HVACR machinery products and equipment in New York, and particularly with the development of such machinery products and equipment for sale only in New York.

e. Making sales to plaintiff – for resale to plaintiff's customer's in accordance with the representation agreements – of virtually all of the $17 Million worth of, *inter alia*, condensers, condensing units, chillers and fluid coolers manufactured by defendant, including nearly $1 Million of equipment in the first nine months of 2007.

f. Delivering $17 Million worth of, *inter alia*, condensers, condensing units, chillers and fluid coolers manufactured by defendant – including close to $1 Million in the first nine months of 2007 – into the State of New York.

5. To the extent that Defendant's Motion seeks, as alternative relief, a transfer of this case to the Northern District of Oklahoma, it is respectfully submitted that the Swank Aff. fails to identify any of the grounds – most particularly the convenience of third-party witnesses – which would support a transfer. Indeed, all of the third-party witnesses likely to be called at trial by plaintiff, who are specifically identified by name and whose anticipated testimony is described, *infra.*, at "Argument, Point Two" are located in New York

or New Jersey and their convenience would not be served by a transfer of this case.

## BACKGROUND:

### Defendant's Twelve Years of HVACR Sales in New York:

6.          HVACR machinery, products and equipment includes condensers, condensing units, chillers, fluid coolers and roof-top units, and is a crucial element in the construction of all office and apartment buildings, whether large skyscrapers, smaller "taxpayers" or other structures. plaintiff serves as the exclusive representative in the New York metropolitan area for a number of manufacturers of HVACR equipment, including defendant.

7.          The construction of a typical New York building is a complex process and the selection, design and engineering of HVACR equipment is a lengthy, time-consuming exercise, which often stretches over several years. Since 1996, plaintiff worked with defendant to develop personal contacts and assist defendant in developing an understanding of the legal requirements needed to make sales of defendant's HVACR products, machinery and equipment which are specifically designed for use in New York area buildings.

8.          Thus, the effort by Defendant's Motion to limit the analysis of defendant's contacts with New York to the year 2007 (*see*, *e.g.*, Swank Aff., ¶¶ 9- 11) is incomplete, and ignores the fact that although plaintiff's exclusive representation of defendant may be only for a term of one year, the design, engineering, manufacture and installation of HVCAR equipment sold during a particular year necessarily continues after the expiration of that year. Indeed, as of the termination of the exclusive representation agreement on or about March 2, 2008, plaintiff had placed over one hundred (100) projects for which equipment was designed, engineered and/or manufactured, or for which prices quoted, by defendant.

9.          The exclusive representation agreement which expired on March 2, 2008 cannot be viewed in isolation, as if the preceding eleven agreements and all the contacts which defendant had with New York since 1996 never occurred. Indeed, these contacts – which included obtaining MEA numbers from the NYC Building Dept. which remain in use today – are continuing and constitute defendant's purposefully availing itself of the benefits and protections of New York laws in connection with the 2007 representation agreement.

10.         The record is clear that, in addition to numerous personal visits to New York, defendant purposefully inserted itself into New York in hundreds of e-mails, phone calls and letters, regarding the representation agreements in 2007. Indeed, in the nine months of 2007 which preceded defendant's unlawful breach of contract, defendant sold close to $1 Million of HVACR machinery products and equipment to plaintiff, and, on September 21, 2007, when defendant purported to terminate the representation agreement, plaintiff had bids of over $3 Million placed with defendant (*see*, ¶ 18, *infra.*).

**Plaintiff's Performance of Its Duties**
**Pursuant to the Parties' Agreement:**

11.         In or about 1996, plaintiff and defendant entered into the first of eleven written agreements, which were written solely by defendant (and which contain no "venue" clause), each of which had a duration of one year and expired in March of each year, pursuant to which plaintiff became and remained defendant's exclusive representative in the New York metropolitan area which has always been defined as: "The Following Counties in the State of New York: Brooklyn, Queens, Manhattan, Bronx, Staten Island, Long Island, Westchester, Putnam, Orange, Rockland." ("the New York Metropolitan Area")*; see*, Schedule A to

Exhibit A, annexed to Defendant's Motion; *see*, *also*, Schedule A to the 2003 representation agreement, which, as an example of the representation agreements made since 1996, with is annexed hereto as Exhibit B.

12.     Since 1996, plaintiff, in connection with the performance of its obligations as the exclusive New York Metropolitan Area representative of defendant: (A) Developed a fair share of the market reasonably available for defendant's products; (B) Provided adequate customer service of defendant's HVACR products and equipment; ( C ) Maintained sufficient working capital to represent defendant; (D) Used resources necessary to effectively represent defendant; (E) Worked closely with defendant in the development and marketing of HVACR machinery, products and equipment; (F) Promoted the goodwill for defendant; (G) Maintained a sufficient organization to accomplish the effective coverage and development of defendant's machinery, product and equipment; (H) Maintained contacts with builders, architects, engineers and others involved in the construction business in the New York Metropolitan Area; (I) Prepared catalogs and other presentations of defendant's HVACR machinery, products and equipment to purchasers and potential purchasers of defendant's HVACR machinery, products and equipment; and (J) Advised builders and engineers with respect to the most appropriate HVACR machinery, products and equipment manufactured by defendant for the various construction jobs performed or undertaken in the New York Metropolitan Area.

13.     Plaintiff has prepared a schedule showing all of the sales of defendant's HVACR machinery and equipment during the past eleven years, throughout the terms of all of the representation agreements since 1996. As is shown by this schedule, after the first two years,

plaintiff's sales of defendant's HVACR equipment in the New York Metropolitan Area have

consistently exceeded $1,000,000.00, as follows:

|    | Year: | Sales by Defendant: |
|----|-------|---------------------|
| a. | 1996 | $     5,472.33 |
| b. | 1997 | $   640,738.95 |
| c. | 1998 | $ 1,708,468.44 |
| d. | 1999 | $ 1,106,439.77 |
| e. | 2000 | $ 3,610,334.39 |
| f. | 2001 | $ 1,201,028.05 |
| g. | 2002 | $ 2,032,032.53 |
| h. | 2003 | $ 1,298,431.31 |
| i. | 2004 | $ 1,586,858.52 |
| j. | 2005 | $ 1,317,800.86 |
| k. | 2006 | $ 1,618,175.94 |
| l. | 2007 (placed through 9/21/07) | $   904,946.76 |

A copy of the schedule prepared by plaintiff, identifying all sales by purchaser,

defendant's order number and amount of sale and whether the sale was pursuant to a standard

commission, as shown by the letter "c", or was purchased by plaintiff for subsequent re-sale

to plaintiff's customers, with customer names redacted, is annexed hereto as Exhibit C.

14.         In an e-mail circulated on January 8, 2007, defendant identified plaintiff has having

been Number "1" of its "2006 Top Performers"in equipment sale and stated: "Thanks as

always to the Top Dogs of TSI".  Likewise, in defendant's in-house newsletter, defendant

identified plaintiff as the top seller of Technical System products as of April/May of 2006.

Copies of defendant's e-mail dated January 8, 2007, and pages1 and 3 of defendant's "The

Chilling News", dated April-May, 2006,  are annexed hereto as Exhibit D.

15.         In March, 2007, as a reward for the volume of sales generated by plaintiff, defendant

invited plaintiff to the Professional Golf Association championship tournament to be played

near defendant's place of business in Tulsa, Oklahoma, in August, 2007, and advised

plaintiff: "If you have a customer you want to bring to this, I am giving you first shot at getting on the list".  Accordingly, in the weeks just prior to September 21, 2007, defendant made arrangements relating to plaintiff's attendance at the PGA Tournament, as shown by defendant's e-mails sent during July and August, 2007 are annexed hereto as Exhibit E.

**Defendant's Alleged Termination of
The Representation Agreement**

16.         On August 20, 2007, defendant issued an announcement that "Sam Jones, Executive Vice President responsible for Sales and Marketing", who was plaintiff's primary contact with defendant, would be replaced by Kevin Trowhill,  of "Webco, Inc. (CES Company) ["Webco"] in Springfield, Missouri. While at Webco, Kevin, was National Sales Manager." A copy of defendant's announcement of August 20, 2007 is annexed hereto as Exhibit F.

17.         Upon information and belief, on or about September 5, 2007, Mr. Trowhill commenced his duties on behalf of defendant.

18.         Throughout September, 2007, plaintiff continued to present bids to defendant for HVACR machinery and equipment in the New York Metropolitan Area, including the following bids and orders for equipment manufactured by defendant:

a.         On September 19, 2007, a bid with a value of $1,615,000.00;
b.         On September 20, 2007 Order T-7924 with a value of $25,116.00;
c.         On September 20, 2007, Order T-7924 with a value of $24,726.00;
d.         On September 21, 2007, Order T-7505 with a value of $1,745.00;
e.         On September 21, 2007, a bid with a value of $1,110,822.00.

Copies of e-mails between the parties confirming each of the foregoing bids and/or orders, as redacted, are annexed hereto as Exhibit G.

19.         The representation agreements all set forth the following with respect to their

termination by defendant:

> This agreement may be terminated prior to the expiration of the Term set forth above <u>only as follows</u>: ... ii. Technical Systems may terminate this Agreement at any time if Technical Systems determines, in its sole discretion, that Representative <u>has failed to develop a fair share of the market reasonably available</u> for the Products in light of the of prevailing adequate customer service for the products, <u>lacks sufficient working capital</u> to provide the representation required by the trade in territory or otherwise <u>fails to use the resources necessary</u> to effectively represent Technical Systems.  Technical Systems will provide 30-day protection on outstanding quotes the representative may have at the time of termination. [Emphasis added.]

20.          On September 21, 2007, defendant, by e-mail letter attachment to plaintiff[1], signed by Mr. Trowhill, bearing the reference "Cancellation of Representative Agreement" (the "Cancellation Letter") which, in its entirety, stated:

> Per the terms of our contract agreement, effective today, I am canceling DNT Enterprises, Inc. representation contract for Technical Systems' products.

> Technical Systems will protect your outstanding quotations for a period of 30 days from 9/21/07.  If there are projects that you would like protection beyond 30 days please identify those projects on your list and we will determine on a project by project basis the extent, if any, of extended protection.  This list must be submitted no later than 9/27/07.  After than time Technical Systems will have no obligation to protect your outstanding quotations.  If you have a project that   is closing within those 30 days that is not on the protected list, we will deal with it on a job by job basis.

> I appreciate all of your efforts in representing Technical Systems equipment, <u>but I feel it is in our best interest to pursue a different direction for representation</u>.  I wish you the best of luck.  If

---

[1]          The representation agreement required that a "registered letter" be sent to plaintiff; defendant failed to comply with this contractual requirement.  The statement in the Swank Aff., at ¶ 15, that, on September 21, 2007 Mr. Trowhill "sent a letter from Oklahoma to DNT cancelling the Contract" is, similarly, inaccurate.

we can be of any service on an individual basis, don't hesitate to call.
[Emphasis added.]

A copy of the Cancellation Letter is annexed hereto as Exhibit H.

21.          Thus, the Swank Aff. misstates matters where, in describing the termination of the

Representation Agreement, it states, at ¶13: "the early termination thereof <u>was based on the</u>

<u>unsatisfactory performance of DNT during the contract term.</u>"   In fact, defendant failed to

give any reason other than "I feel it is  in our best interest to pursue a different direction for

representation."; plaintiff was not terminated due to "unsatisfactory performance".

**Plaintiff Sustains Damages By Reason**
**of the Issuance of the Cancellation Letter:**

22.          Plaintiff's relationships within the relatively small community of builders, architects

and engineers involved in the selection, purchase and installation of HVACR products,

machinery and equipment in the New York Metropolitan Area is an essential element of

plaintiff's business. Plaintiff worked long and hard to develop its contacts within that

community on behalf of defendant.  Plaintiff also worked long and hard to educate defendant

with respect to the myriad legal, financial and physical exigencies of selling and installing

HVACR equipment pursuant to the NYC Building Code and the City's Administrative Code.

23.          Although defendant is but one of many manufacturers of HVACR equipment for

whom plaintiff serves as a representative in the New York Metropolitan Area, the unilateral

and wholly unanticipated loss of defendant prior to the expiration of the 2007 representation

agreement had a considerable negative impact on plaintiff's relationship with construction

community in the New York Metropolitan Area..  Thus, the assertion in the Swank Aff., at

¶ 16, that "TSI denies that the temporary termination caused any damages to DNT." is not

supported by the facts and, all of the witnesses to the damages sustained by plaintiff by reason of defendant's breach of contract are located in New York.  Accordingly, this case must be tried in New York.

24.        Subsequent to the issuance of the Cancellation Letter, plaintiff received inquiries from builders, architects, engineers and/or other persons in the construction industry in the New York Metropolitan Area with respect to the status of plaintiff's relationship with defendant, including, specifically, whether the representation agreement had been terminated by defendant and whether plaintiff was still the exclusive representative of defendant in the New York Metropolitan Area.  Plaintiff would not lie to the construction community and was compelled to advise builders, architects, engineers and/or other persons in the construction industry in New York of the alleged termination of the representation agreement by defendant, or to otherwise confirm the issuance of the Cancellation Letter.

25.        At the time that the Cancellation Letter was issued, as shown by the schedule set forth at ¶18, *supra.*, plaintiff had placed, and was awaiting a response to a sealed written bid with respect to: (A) 200 Fifth Avenue, a bid with a value of $1,615,000.00, which specifically required the use of certain, particularly identified equipment manufactured by defendant, or its equivalent; and (B) Flushing Town Center, a bid with a value of $1,110,822.00, the specifications of which required the use of certain, particularly identified, *inter alia*, equipment manufactured by defendant, or its equivalent.   Plaintiff advised defendant that the issuance of the Cancellation Letter would jeopardize those bids.  As a direct result of defendant's issuance of the Cancellation Letter, plaintiff was not awarded the contract with respect to 200 Fifth Avenue project and plaintiff's bid with respect to the Flushing Meadow

project has been jeopardized, although no final decision has been made.

26.      During the period since the issuance of the Cancellation Letter, defendant, acting in bad faith, repeatedly failed or refused to provide timely information to plaintiff with respect to pricing, delivery terms and other information necessary for plaintiff to sell defendant's products and repeatedly and without justification and in bad faith, as a result of which, plaintiff was unable to sell defendant's products at the rate it should have in the period subsequent to September 21, 2007.   The assertion in the Swank Aff., at ¶ 16, that defendant "continued to support [plaintiff's] efforts to obtain orders from its customers" is simply not true, as shown by, for example e-mails from plaintiff to defendant in October and November, 2007, copies of which, with portions redacted, are annexed hereto as Exhibit I.

27.      Finally, as of the date of the termination of the representation agreement, *i.e.,* on or about March 2, 2008, plaintiff has submitted over one hundred (100) projects to defendant for price quote and/or design.  As of the date hereof, although correspondence has been written between counsel regarding this matter, defendant has not yet confirmed to plaintiff that defendant will honor all of its commitments and obligations to plaintiff pursuant to the representation agreements.   In the event defendant fails to undertake to make this commitment, plaintiff may be required to either commence a plenary action to assert a new claim against defendant, or again amend the complaint herein to enlarge or re-plead its existing claim for Anticipatory Breach of Contract.   A list prepared by plaintiff, which has been furnished to defendant, which identifies the one hundred (100) projects for which such protection is required, is annexed hereto as Exhibit J.

**ARGUMENT:**

**POINT ONE:**

**DEFENDANT'S CONDUCT, EVEN IF LIMITED SOLELY
TO THAT RELATED TO THE 2007 REPRESENTATION AGREEMENT
IS SUFFICIENT TO WARRANT THE IMPOSITION OF LONG ARM JURISDICTION**

**Defendant's Actual Visits to New York
During the Past Twelve (12) Years, Including 2007:**

28.         Throughout the past twelve years defendant's officers and employees  – not

subcontractors or representatives –  for  personal visits to New York in connection with the

installation of  HVACR equipment, as well as sales meetings, social events sponsored by

plaintiff and sporting events.  Most recently, defendant has visited New York in connection

with the following business matters, as is demonstrated, for example, as follows:

a.         In January, 2007, Duane Conditt, an employee of defendant came to New

York "for  the installation of the heaters", as shown by an e-mail from defendant,

dated January 18, 2007, a copy of which is annexed hereto as Exhibit K.

b.         On April 26, 2005, Chuck Russell and Kendall Kihega, employees of

defendant, attended a meeting at Huntington Hospital, in Suffolk County, New York.

Copies of the "sign-in" sheet with Mr.  Russell's and Mr. Kihega's signatures and

identification as "RAE Corp.", *i.e.,* defendant (*see*, lines 11 and 12; Huntington

Hospital,"H.H.", are shown on lines 1-4), are annexed hereto as Exhibit L.

c.         On February 16, 2005, "A Technical Systems technician and [plaintiff's

employee, Jim Temple] surveyed [a] unit" located at the HIP-Bayridge Medical

Center, in Brooklyn, New York, as shown in Mr. Temple's letter dated May 4,2005,

a copy of which is annexed hereto as Exhibit M.

d.    In June, 2003, employees of defendant traveled the Biltmore Theater, in New York County, *see* correspondence from Sam Jones, of defendant, dated June 23, 2003, and e-mail from Chuck Russell of defendant, confirming that "Alan Swank ... will be on the job site am [*sic.*] of 6-3-03", copies of which are annexed hereto as Exhibit N.   Difficulties with the Biltmore Theater contract resulted in litigation in which defendant was named as a Third Party Defendant in an action in the Supreme Court of the State of New York, County of New York (Third Party Index No. 590882/07); a copy of the Third Party Summons is also included within Exhibit N.

e.    Alan Swank, a technician employed by defendant, performed various equipment start-ups and troubleshooting tasks in the New York Metropolitan Area over the years since 1996.

29.    In addition to the attendance by Chad Smith, upon information and belief, the Sales Manager of defendant, at nearly every Summer Barbecue and Christmas Party from 1998 through 2004, defendant's officers and employees traveled to New York to attend the following social events (among many others) hosted by plaintiff in New York in support of the parties' business relationship:

| Date or Year: | New York Event: | Defendant's Employee(s), Officer(s): |
|---|---|---|
| 10/15/02 | Rangers Game | Chad Smith, Dimitri Kogan |
| 9/18/03 | Luncheon | Chad Smith, Ron Delerme |
| 10/15/04 | Drinks at ESPN Zone | Eric Swank, Ed McCune, Ron Delerme |
| 10/17/04 | Jets Game (N.J) | Eric Swank and ten of plaintiff's  clients |
| 4/26/05 | Mets Game | Chuck Russell, Kendall Kihega |
| 2005 | Christmas Party | Eric Swank, Sam Jones |
| 7/31/06 | Luncheon | Sam Jones, Adam Meyer |
| 12/6/06 | Christmas Party | Adam Meyer, Mike Conti |

30.        On January 22-24, 2007, prior to the expiration of the 2007 representation agreement, defendant, by a number of its officers and employees, including Mr. Trowhill, attended the "AHR Expo", a trade show for the HVACR industry at the Javits Convention Center in New York County.  Defendants had a large exhibit at the "AHR Expo" and, upon information and belief, sought to solicit business there.  A copy of some of defendant's promotional material relative to the "AHR Expo" is annexed hereto as Exhibit O.

31.        Thus, defendants cannot deny that, for virtually the entire duration of the parties' relationship, defendants repeatedly traveled to New York for strictly business purposes, as well as social purposes related to business.  As set forth in the accompanying Memorandum of Law, although New York does not require that a defendant actually set foot in New York to render it susceptible to Long Arm Jurisdiction, here it is undeniable that defendants repeatedly entered in New York for purposes related to the transaction of business.

### Defendant Enjoys the Benefits and Privileges of New York Law by Obtaining MEA Numbers and By Complying with the New York City Administrative Code:

32.        The NYC Building required defendant to obtain MEA Numbers for its HVACR equipment, as described in the NYC Building Dept. website [Emphasis added.]:

> It is the responsibility of the manufacturer to obtain MEA acceptance for his or her product. The manufacturer can download the MEA Application Package for detailed information regarding the process. The applicant is required to provide a typewritten description of the product, include photographs, drawings, schematics, and marketing materials, fill out the acceptance application form MEA-1, and provide a compact disk with draft language for the final acceptance document (form MEA-3) as he or she would like to see it.
>
> In addition, the product must be tested by a Department-accepted testing laboratory or testing service to ensure that the product

conforms to the Code-required standard. <u>The manufacturer must provide a sample of his or her product to the testing laboratory or testing service for the test, pay the required fee, and at the completion of the test have the laboratory fill out the testing form MEA-2. All three completed forms, the product data, the test reports and the application fee comprise the application.</u> ...

Copies of the relevant pages of the NYC Building Dept. website are annexed hereto as Exhibit P.

33.    Plaintiff maintains a record of MEA numbers for all of the manufacturers represented by plaintiff; these records reveal that the MEA numbers for defendant's HVACR machinery products and equipment is as follows (the final number, *e.g.,* "97" and "06" indicates the year that the application for the MEA number was made by defendant, which was subsequent to plaintiff's commencement as defendant's exclusive representative in 1996):

| Product: | MEA Number: |
|---|---|
| "WC" series chillers | 12-97-E |
| (Packed air and water cooled) | |
| "C-AC" air cooled condensers | 53-97-E |
| "FC" Fluid coolers | 54-97-E |
| "CU-AC" air cooled condensing units | 55-97-E |
| "TPAH" series | 577-06-E |

34.    Likewise, the Administrative Code of the City of New York, at subchapter 18 of chapter 4 of title 27 (*i.e.,* the Refrigeration Code), relates to mechanical refrigeration; the Administrative Code also sets forth "Maximum Sound Power Levels for Exterior Mechanical Equipment Adjoining Buildings" (*i.e.,* the Sound Code) and set forth a number of requirements which are unique to the City of New York, with which HVACR equipments manufacturers must comply, if their products are to be sold in New York City.  Plaintiff worked closely with defendant to insure that defendant's equipment was manufactured in a

manner which was certain to comply with the Refrigeration Code and the Sound Code.

35.          Had defendant not complied with these unique laws, defendant's HVACR machinery, products and equipment would not and could not have been sold in New York.  As such, defendants enjoyed the benefits and protections of New York law relative to the representation agreement and are subject to Long-Arm Jurisdiction. A schedule identifying jobs tailored to New York Administrative Code requirements, together the relevant portions of the Refrigeration Code and the Sound Code are annexed hereto as Exhibit Q.

**Defendant's Insertion of Itself Into
New York By Sending E-mails and Other Communications
During the Past Twelve (12) Years, and Particularly in 2007:**

36.          Since 1996, defendants sent hundreds of e-mails, placed hundreds of telephone calls and sent frequent, regular correspondence and bills to plaintiff each year.  The e-mails were written from defendant to all of plaintiff's employees in New York and consistently describe defendant's attempts to manufacture products in 2007 for sale in New York, in compliance with NYC Building Code requirements, pursuant to the representation agreements. Hundreds of such e-mails were sent to plaintiff annually by defendant's officers and employees, including Adam Meyer, Faisal M. Baig, Chuck Russell, Judy Smith, Angela Breedlove, Michael McKay, Larry Hudson, Sam Jones, John Jackson and Eric Swank. As an exemplar of the hundreds, if not thousands, of e-mails sent from defendant since 1996, and particularly with respect to the 2007 representation agreement, approximately fifty (50) of defendant's e-mails sent to just one of plaintiff's employees, Jim Temple, during the period from April through September 2007 – which have been redacted to avoid burdening the Court with an application for a Sealing Order – and are annexed hereto as Exhibit R.

37.    As set forth in the accompanying Memorandum of Law, the jurisprudence now promulgated by the New York Court of Appeals holds that when a foreign corporation seeks to consummate a New York transaction or to invoke New York's laws – such as, for example, compliance with the requirements of the NYC Building Code – the assertion of long-arm jurisdiction is proper.  Accordingly, defendant, having enjoyed the benefits and protections of New York law, and having actually inserted itself into New York by means of actual visits to New York and inserting itself into New York by calling, writing and e-mailing, is susceptible to long arm jurisdiction based on its unilateral, unlawful and unjustified termination of the 2007 Representation Agreement on September 21, 2007.

### Sales Were Made to Plaintiff in New York

38.    As shown on Exhibit C hereto, to the extent that plaintiff was paid according to traditional commission arrangements, as opposed to "buy and sell" arrangements, these sales are identified by the letter "c".  Very few of these sales were made according to traditional commission arrangements, thus undermining the statement in the Swank Aff., at ¶ 6, that: "On occasion, the independent contract will offer to purchase TSI's equipment for their own account in Oklahoma, and resell to its customers."  Thus, leaving aside the issue of where the purchase is made, which is portrayed inaccurately in the Swank Aff., the amount of purchases by plaintiff for plaintiff's own account can hardly be characterized as being "On occasion".  Copies of representative invoices for sales from defendant to plaintiff during the period subsequent to September 21, 2007, as redacted, are annexed hereto as Exhibit S.

39.    The Swank Aff., at ¶ 14 and ¶20, refers to "FOB" shipping terms, which relate only

to the risk of loss during the shipment to New York, and is not persuasive.  As set forth in plaintiff's accompanying Memorandum of Law, shipments being made "FOB Oklahoma" should not be weighed heavily in determining the existence of personal jurisdiction.

40.     Finally, upon information and belief, defendant placed bids directly with contractors in New York City, apparently in violation of the representation agreement.  In any event, for the reasons set forth in the Memorandum of Law in opposition to Defendant's Motion, the imposition of New York's Long-Arm Jurisdiction does not offend due process and, indeed, comports with contemporary notions of the susceptibility of foreign litigants to New York jurisdiction as found by the New York Court of Appeals.

## POINT TWO:

## THIRD PARTY WITNESSES ARE IN NEW YORK

41.     Defendant's Motion, for its alternative relief, seeks to transfer this case to the Northern District of Oklahoma, in connection with which the Swank Aff., at ¶ 17, identifies only the convenience of defendant's employees (or former employees), and makes the self serving statement that: "Having to travel to New York, where we have no offices or employees, would be extremely inconvenient and burdensome to TSI and its employees."

42.      Indeed, precisely the same point can be made by plaintiff with respect to keeping this case in the New York venue selected by plaintiff, which will enable to call as witnesses its employees, including but not limited to  Jim Temple, Prasanna Krishnapersaud and Robert Hansen, who can testify with respect to a number of items, including, particularly, defendant's bad faith subsequent to the Cancellation Letter in September, 2007 by failing to provide timely pricing and information regarding delivery, lead-times and closing dates,

thereby rendering it impossible for plaintiff to service those customers of plaintiff to whom plaintiff would ordinarily recommend defendant's HVACR products, machinery and equipment. However, while the convenience of the parties may be considered, the plaintiff's selection of the forum should not be disturbed, especially where the convenience of the witnesses plainly favors the forum selected by the plaintiff.

43.    As described, *supra.*, all of the damages which plaintiff sustained by reason of the unlawful termination of the 2007 Representation Agreement were sustained in New York, and have, thus far, arisen as a result of plaintiff's loss of over $3 Million in contracts which were out for bid on at the time that defendant issued the Cancellation letter was September 21, 2007. In order to prove its case, plaintiff will be required to call the following third-party witnesses, who will give testimony as follows:

a.     Richard Goodman, Engineer, of New York, who will testify to having heard that the exclusive representation agreement was cancelled by defendant in September, 2007. This testimony will relate to the extent that defendants termination of the agreement caused plaintiff to sustain within the community of engineers responsible for the selection and installation of HVACR machinery, products and equipment, and the manner in which the unlawful purported termination was known within the industry.

b.     Greg Fellner, Professional Engineer, of New York, who will testify with respect to the 200 Fifth Avenue project, which plaintiff lost due to the cancellation of the exclusive representation agreement by defendant in September, 2007. The 200 Fifth Avenue project, as shown in ¶ 18 and Exhibit G, *supra.*, was worth in

excess of $1.5 Million.  This witness will testify with respect to, *inter alia* the specifications of the job which was specified the use of defendant's HVACR machinery, products and equipment.

c.      Bruce Lilker, Professional Engineer, of New York, who will testify with respect to the 200 Fifth Avenue project, which plaintiff lost due to the cancellation of the exclusive representation agreement by defendant in September, 2007.This witness will also testify with respect to, *inter alia* the specifications of the job which was specified the use of defendant's HVACR machinery, products and equipment.

d.      Joe Sabarra, Gil Bar Industries, Inc., New York and  Jon Gil, Gil Bar Industries, Inc., New York will testify with respect to contacts had with defendant prior to September 21, 2007, including defendant's efforts to replace plaintiff with Gil Bar Industries, Inc., as defendant's exclusive representative.

e.      Jim Carabello, Manufacturers Representative, of New Jersey, who will testify with respect to the manufacturer's relationship to the exclusive representative.

f.      Chuck Duwe, formerly with plaintiff, of New York, who will testify with respect to the business relationship between plaintiff and defendant, and the extent to which plaintiff developed defendant's business in New York.

44.      In view of the foregoing, it is respectfully submitted that the interests of the witnesses will best be served by allowing this case to remain in the Southern District of New York, where all of the foregoing witnesses are located.  There exists no lawful basis to  transfer the venue of this case to the Northern District of Oklahoma, and defendant's alternatively requested relief should be denied.

-21-

WHEREFORE, in view of the foregoing and based upon the failure of Defendant's Motion to set forth a legally cognizable ground for dismissal or transfer of the case, as set forth in the accompanying Memorandum of Law in opposition to Defendant's Motion, it is respectfully submitted that Defendant's Motion should be denied in its entirety and plaintiff should be granted such other relief as is consistent with the denial of Defendant's Motion, including the imposition of costs and legal fees, to the extent permitted by law, upon defendant.

S/Neil Thakker

_____
NEIL THAKKER

Duly sworn to the 1st
day of April, 2008
S/Samuel E. Kramer

_____
Notary Public

Samuel E. Kramer
Notary Public, State of New York
Reg No.: KR 4795609
Qualified in Nassau County
Commission Expires: 2/28/10

-22-